UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————————x

NEIL GONZALEZ,

        Plaintiff,

      -against-                        No. 18-cv-10270 (CM)

METRO-NORTH COMMUTER RAILROAD,

        Defendant.
——————————————————————————————x


**DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

McMahon, CJ:

      Plaintiff Neil Gonzalez ("Plaintiff") brings this action against defendant Metro–North Commuter Railroad ("Metro–North") alleging a violation of the whistleblower provision of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. This Court has subject matter jurisdiction in this case without regard to the amount in controversy pursuant to 49 U.S.C. § 20109(d)(3).

      The Defendant now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the defendant's motion is granted.


**FACTUAL BACKGROUND**

      The following facts are drawn from evidence in the record and the parties' Local Rule 56.1 statements. They are undisputed except where noted.

## I.    The Parties

Defendant Metro-North is a public benefit corporation and subsidiary of the Metropolitan Transportation Authority. Metro-North operates a commuter railroad in the States of New York and Connecticut. (Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Supp. of Def.'s Mot. for Summ. J. ("Def.'s 56.1") at ¶ 1, Dkt. No. 34).

Plaintiff Neil Gonzalez has been employed by Metro-North as a third railman since 2012. (*Id*. at ¶ 2). The job of a third railman at Metro-North is to inspect, install, maintain, and repair all portions of the third rail system to ensure safe delivery of electrical Direct Current power for distribution and train use. (*Id*. at ¶ 3).

Third railmen at Metro-North are represented by the International Brotherhood of Electrical Workers ("IBEW"). Gonzalez is a member of this union. (*Id*. at ¶ 4).

## II.    Plaintiff's Disciplinary History

### 1.    The Testing Incident

On October 22, 2015, Plaintiff left an assigned work location without permission and interrupted a test that was being administered to a class of Metro-North trainees. He was charged with insubordination and conduct unbecoming a Metro-North employee,[1] unauthorized absence from work, and violation of General Safety Instruction 200.1. Plaintiff had been told by a supervisor to remain at his assigned work location; instead, he left the premises for several hours, went to another Metro-North location, entered a classroom while a test was being administered to a class of trainees, and told the trainees not to take the test. (Dkt. No. 36, Ex. 19). Despite repeated instructions to leave the room, he remained. (*Id*.)

---

[1] Per Metro-North policy, insubordination occurs "when an employee willfully refuses to obey an order or directive given by a manager or supervisor." (Dkt. No. 36, Ex. 18).

Plaintiff signed an investigation and trial waiver admitting the conduct, waived his right to a disciplinary hearing and agreed to a 45-day suspension. (*Id.*)

2. <u>The Mott Haven Power Department Incident</u>

On June 22, 2017, Plaintiff was scheduled to undergo a medical exam following a medical leave of absence. After leaving the Office of Health Service for the medical exam, Plaintiff showed up at Metro-North's North Mott Haven Power Department Headquarters. The Parties dispute whether Plaintiff was medically cleared to return to work on that day. However, it is undisputed that Plaintiff was told to leave Metro-North property but did not comply for some time. It is also undisputed that Supervision at North Mott Haven subsequently called the police before Plaintiff eventually left the property. (Dkt. No. 36, Ex. 17). He was reprimanded for insubordination and later sent a formal warning letter.

3. <u>The Lunchables Incident</u>

On July 10, 2017, Plaintiff was sent home for insubordination and conduct unbecoming a Metro-North employee.

That night, Plaintiff reported for work at Metro-North for an overnight shift from 10 p.m. to 6 a.m. (Dkt. No. 36, Ex. 3, Gonzalez Tr. At 32-33). His work gang that evening included two other third railmen, Jonathan Morales and Javier Saenzdeviteri, Foreman Michael Walsh, and Supervisor William Mulligan. (*Id.* at 33-35). The gang was tasked with: (1) bringing materials to the Park Avenue Tunnel at 86th Street from the Mott Haven Headquarters, (2) moving materials within the Park Avenue Tunnel from 72nd Street to 86th Street, and then (3) installing brackets to upgrade the channels, brackets, and insulators in the Park Avenue Tunnel to mitigate the risk of electrical fires in the tunnel. ("Def.'s 56.1" at ¶ 9).

At 2:55 am, Walsh told the gang that their contractually-permitted 20-minute break would begin at 3:00 am. (Dkt. No. 51, Gonzalez Tr. 102:2-6). The group drove a Metro-North truck to a 7/11 to get something to eat and returned. At 3:20 am, Walsh approached the truck in which the men were sitting and told them to get back to work. (*Id*.) Plaintiff told Walsh that he "was still eating and according to the time frame from when [the gang] left" their 20 minute-break was not over. (Id. 103:5-6). Plaintiff told Walsh that he still had 10 minutes left on his break and that he would not leave the truck. *Id*.

Foreman Walsh then advised Supervisor Mulligan of the men's refusal. Mulligan walked to the truck and told the men to return to work. (SOF ¶ 13). One of the other members of the gang left the truck and started walking back to the work area. Plaintiff continued eating his Lunchables and did not get out of the truck. *Id*. Mulligan then gave Plaintiff a direct order to return to work. *Id*. Plaintiff "replied to him" but did not leave the truck. (Dkt. No. 51, Gonzalez Tr. 105:20-25). According to Plaintiff, Mulligan then turned his back and "grabbed his cell phone." (*Id*. 106:2). At that point, Plaintiff left the truck with another member of the gang and began walking to the work site, whereupon Supervisor Mulligan approached Plaintiff and sent him home for insubordination. (*Id*. 106).

4. The Overtime Incident

On July 17, 2017, Plaintiff reported for his overnight shift from 10 pm to 6 am. (SOF ¶ 15). Foreman Michael Walsh and Supervisor William Mulligan were his supervisors during the shift. That night, the members of the gang worked in different locations.

At approximately 4:00 am, all members of the gang were instructed to return to Metro-North's Mott Haven facility. (SOF ¶ 15). At approximately 4:20 am, Mulligan received a call from the Power Director advising him that a circuit had gone down on a Mount Vernon track and

needed repair. (SOF ¶ 17). Malfunctioning circuits affect the safe operation of trains on that track and, if not fixed, interfere with train service. Because Metro-North defines an emergency as "Anything that impedes the safe travel of train traffic" (Walsh Tr. at 44), the downed circuit was considered an emergency. According to the CBA between Plaintiff's union and Metro-North, the existence of an emergency entitles Metro-North to keep union employees past the end of their shifts. (SOF ¶ 21).

Mulligan called Walsh at 4:23 am to explain the situation and told him to go with the gang to make the necessary repairs. Mulligan arrived at the track first and obtained "foul time" on the track. Foul time is time that the track is taken out of service so workers can safely work on the track.

While en route to the track, Walsh received a call from Plaintiff saying that he could not stay past the end of his 6:00 am shift. (SOF ¶ 19). Walsh told Plaintiff that he was still on shift and that this was an emergency. He then told Plaintiff that he should go to the worksite with the rest of the gang and discuss the issue with Supervisor Mulligan.

By the time Plaintiff arrived, it was around 5:40 am. The rest of the gang was already there and working on the track. (*Id.*) Plaintiff again told Foreman Walsh that he could not stay after his shift ended and called his union representative, John Carr, on speakerphone. (SOF ¶ 20). At Walsh's direction, Plaintiff took his complaint to Supervisor Mulligan, who was also present and working on the track. (*Id.*) Mulligan told Plaintiff that the emergency required immediate repair. (SOF ¶ 21).

Plaintiff called his union representative again while standing next to the track and held the phone to Mulligan's ear. Mulligan gave him a direct order to put the phone away and return to work. (*Id.*) Metro-North's personal electronic device usage policy prohibits use of personal

electronic devices within four feet of the nearest running rail. (*Id.*) Plaintiff told Mulligan that he was four feet from the track and could therefore use his phone. Again, Mulligan told Plaintiff to go back to work and Plaintiff said he "was calling [the] union rep to try to resolve that issue." (SOF ¶ 22). By then, Plaintiff had refused multiple orders. Mulligan instructed him to go back to headquarters, swipe out and go home. (*Id.*) The work gang was unable to complete the repair within its scheduled time and had to request additional foul time, taking the tracks out of service for a second period during the morning rush hour. (SOF ¶ 14).

### III. Disciplinary Charges

Metro-North brought disciplinary charges against Plaintiff for the two July 2017 incidents of insubordination. He was taken out of service pending the outcome of the disciplinary proceedings. (SOF ¶ 25, 27-28).

Disciplinary hearings were held pursuant to the CBA between Plaintiff's union and Metro-North, on September 8 and 11, 2017. (SOF ¶ 29-30). The hearings were run by Metro-North Hearing Officer James Walker, who presided over the hearings pursuant to Metro-North's usual hearing procedures. Plaintiff was represented by Arthur Davidson, his union's chairman, at both of his disciplinary hearings. (*Id.*)

The hearing transcripts, along with a summary and recommendation from Walker, were then sent to James Pepitone, Director of the Metro-North Power Department, to review and determine the appropriate discipline. (SOF ¶ 31-32). The level of discipline imposed by the reviewing officer depends on the employee's disciplinary history, the CBA, and the severity of the charges. Pepitone decided that dismissal was the appropriate penalty, and so notified Plaintiff by mail on September 29, 2017. (SOF ¶ 32-33). Through his union, Plaintiff appealed the termination through the process set out in his union's CBA. He first appealed to Metro-North's

Labor Relations department, which upheld the termination decision. (SOF ¶ 35). He then appealed to an independent arbitrator appointed jointly by Metro-North and the union, who also upheld the termination. (*Id.*)

## IV.     Protected Activity

Notwithstanding all the above, Plaintiff claims that he was really fired because he engaged in whistleblower activities under the Federal Railroad Safety Act and seeks review of Metro-North's termination decision. The Complaint identifies two such activities.

### 1.   Unsafe Condition of Company Trucks

Plaintiff's first allegedly protected act of whistleblowing occurred when Plaintiff reported unsafe conditions of company trucks to Rubin Garcia, the Metro-North employee in charge of maintaining company vehicles. (Hetchkopf Ex. 3, Gonzalez Tr. at 27:2-16). At his deposition, Plaintiff could not recall the exact date of his report but estimates that it was when he returned to work after his medical leave of absence in July of 2017. (*Id.* at 27:10-11). Plaintiff also could not recall whether his report was about a specific truck or about a "fleet of company trucks," as alleged in the Complaint. (*Id.* at 27-28; Hetchkopf Ex. 1 (Complaint ¶ 50)). Plaintiff did recall that the truck he reported "was a piece of junk overall. It had air-conditioning problems. There were wires hanging out from underneath the dashboard … by where the brake pedal and gas pedal were, which, to [Plaintiff], was a huge safety concern." (Dkt. No. 36, Gonzalez Tr. at 30:13-19). Plaintiff testified that he frequently made these types of complaints. (*Id.* at 27:24-25; 28:25-29:4). Plaintiff "actually dropped off a couple [trucks for repair] … when asked to." (*Id.* at 30:9-10).

Neither Mr. Garcia, nor anyone else at Metro-North told Plaintiff to stop reporting any safety concerns. (*Id.* at 29-32).

2. July 9 Complaint about Foreman Michael Walsh's Qualifications

The second allegedly protected activity occurred on the night of July 9, 2017 when Plaintiff complained about whether Foreman Michael Walsh had the proper safety qualifications to lead the gang onto the tracks.

At the beginning of Plaintiff's shift, Foreman Walsh gave the required Job Safety Briefing to Plaintiff and the rest of the gang. (Dkt. No. 36, Ex. 4, Walsh Tr. at 75). Plaintiff then raised concerns about whether Walsh was "qualified to be a foreman to take men out onto the tracks to perform work." (Dkt. No. 36, Ex. 3 Gonz. Tr. at 38); (Dkt. No. 36, Ex. 3, Gonzalez Tr. at 37-39).

Walsh informed Plaintiff that he was, in fact, qualified and able to give the Job Safety Briefing. (Dkt. No. 36, Ex. 4, Walsh Tr. at 77). Plaintiff then signed the safety briefing form because "what [they] were actually doing [was] taking materials down to the side of the track. So, it wasn't really … a huge risk factor." (Dkt. No. 36, Ex. 3, Gonzalez Tr. at 42:15-18). Both Mulligan, Walsh's immediate supervisor that night, and James Pepitone, Director of the Metro-North Power Department, later stated that Walsh was qualified to take men onto the tracks on the night in question. (Dkt. No. 36, Ex. 6 Pepitone Tr. at 81:17-22); (Dkt. No. 36, Ex. 7 Mulligan Tr. at 40:4-20; Ex. 7 Mulligan Tr. at 41:14-16).

Metro-North has a process, known as a safety challenge, by which employees can report safety concerns to their supervisors and seek the review of a second supervisor before work resumes. (Dkt. No. 36, Ex. 6 Pepitone Tr. at 66:21-67:19). Plaintiff did not bring a formal safety challenge about Walsh's qualifications. (Def. 56.1 ¶ 11).

# DISCUSSION

## I.      Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. FED. R. CIV. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While the Court must view the record "in the light most favorable to the nonmoving party," *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir.1989) (citations omitted), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975) (citations omitted), the non-moving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (citations omitted). Critically, in an opposition to a motion for summary judgment "Statements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), but must

support the existence of an alleged dispute with specific citation to the record materials. FED. R. CIV. P. 56(c).

Moreover, identifying a "genuine" dispute is not necessarily enough to defeat the motion, because not every disputed factual issue is material in the context of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see generally City of New York v. Philadelphia Indem. Ins. Co.*, 2010 WL 3069654, at *4-5 (S.D.N.Y. July 27, 2010).

## II.    The Federal Railway Safety Act

### A.  Legal Standard

The Federal Railway Safety Act incorporates by reference the burden-shifting test articulated in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), 49 U.S.C. § 42121(b)(2)(B). *See* 49 U.S.C. § 20109(d)(2)(A)(i); *see also Hernandez v. Metro-North Commuter R.R.*, 74 F. Supp. 3d 576, 579 n.1 (S.D.N.Y. 2015). To establish a prima facie retaliation claim under the FRSA, a plaintiff employee must show by a preponderance of the evidence "that (1) [the plaintiff] engaged in protected activity; (2) the employer knew that [the plaintiff] engaged in the protected activity; (3) [the plaintiff] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Hernandez*, 74 F. Supp. 3d at 579 (alterations in original) (quoting *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013)). Failure to satisfy any one of the *prima facie* elements is fatal to a retaliation claim. *Lockhart v. Long Island R.R. Co.*, 266 F.Supp.3d 659, 663 (S.D.N.Y. 2017).

1. *Protected Activity Standard*

To establish that he engaged in protected activity, Plaintiff must make a threshold showing that his alleged act of whistleblowing was protected activity under the FRSA. To count as protected activity under 20109(b)(1), Plaintiff must "establish that his good faith belief in a safety hazard was subjectively *and* objectively reasonable." *See March v. Metro-North Railroad Company*, 369 F. Supp. 3d 525, 533 (S.D.N.Y. 2019) (emphasis in original).

Section 20109(a)(2) is an alternative provision under the FRSA concerned with protecting employees from being retaliated against for refusing to violate Federal law, rules, or regulations. It provides a private right of action to railroad employees "discharge[d], demote[d], suspend[ed], reprimand[ed], or in any other way discriminate[d] against . . . for (2) refus[ing] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security." 49 U.S.C. § 20109(a)(2).

2. *Contributing Factor Standard*

Plaintiff must also demonstrate that his allegedly protected activity was a contributing factor in his dismissal. In *Gunderson v. BNSF Railway Company*, 850 F.3d 962 (8th Cir. 2017), the Eighth Circuit upheld the dismissal of an FRSA retaliation claim on summary judgment because the plaintiff had not produced enough evidence to satisfy the "contributing factor" element of his prima facie case. 850 F.3d at 970. In so doing, the Eighth Circuit specified five highly relevant facts in determining whether plaintiff was disciplined because he made a safety complaint:

> [1] First, the disciplinary investigations that led to [plaintiff's] discharge were completely unrelated to his protected activity. [2] Second, [plaintiff's] prior safety-related activities were remote in time and disconnected from the disciplinary proceedings by an intervening event that independently justified adverse disciplinary action.... [3] Third, [plaintiff] was discharged after disciplinary hearings at which he was represented by union counsel, and the decisions to discharge were upheld by [the railroad] internally and

by a[n] ... arbitration panel. [4] Fourth, the merits of the discharge were again reviewed in a six-day hearing before a [Department of Labor administrative law judge] .... [5] Fifth, the decision to discharge was made by [a railroad division manager] after consulting with his supervisors and with [railroad] human relations officers, not by ... the lower-level supervisors [plaintiff] accuses of safety-related bias.

*Id.* at 969 (internal quotation marks and citations omitted).

If the plaintiff successfully makes out a prima facie case, "then the burden shifts to the employer to demonstrate by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity." *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 663 (S.D.N.Y. 2017) (quoting *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107 (4th Cir. 2016)), *appeal filed* No. 17-2725 (2d Cir. Aug. 31, 2017).

### B. Prima Facie Case

Count I is premised on Plaintiff's reporting of the unsafe conditions of company trucks. (Dkt. No. 1 ¶ 50).

Count II is premised on Plaintiff's complaint about Foreman Walsh's alleged lack of proper qualifications. (Dkt. No. 1 ¶ 51).

The railroad moves for summary judgment as to both counts.

On summary judgment, Plaintiff has failed to make out a prima facie case on either Count.

Count I fails because there is not a scintilla of evidence suggesting that Plaintiff's report about the unsafe conditions of the company trucks was a contributing factor in his dismissal.

Count II fails because Plaintiff's quibbles about Foreman Michael Walsh's qualifications as a Foreman were neither objectively nor subjectively reasonable and so are not protected activity under the FRSA. Further, there is also not a scintilla of evidence suggesting that Plaintiff's complaint about Walsh's qualifications was a contributing factor in his dismissal.

The motion for summary judgment is, therefore, granted.

1. <u>Count I: Plaintiff's complaint about the unsafe conditions of company trucks was not a contributing factor in his dismissal.</u>

Plaintiff's first claim to protected activity occurred when he reported unsafe conditions of company trucks to Rubin Garcia, the Metro-North employee in charge of maintaining company vehicles (Dkt. No. 36, Ex. 3, Gonzalez Tr. at 27:2-16). Regarding one truck, Plaintiff stated that it "was a piece of junk overall. It had air-conditioning problems. There were wires hanging out from underneath the dashboard … by where the brake pedal and gas pedal were, which, to [Plaintiff], was a huge safety concern." (Dkt. No. 36, Gonzalez Tr. at 30:13-19) Plaintiff asserts that he frequently made these types of complaints. (*Id*. at 27:24-25; 28:25-29:4).

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff's reports about the hazardous conditions of the company trucks would be protected activity under the FRSA. However, it is abundantly clear that Plaintiff has failed to adduce any evidence in support of an element necessary for a prima facie claim — that the protected activity was a contributing factor in Metro-North's decision to terminate his employment. *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013).

"In considering [the contributing factor] element, [courts] must take into account the evidence of the employer's nonretaliatory reasons." *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017) (internal quotation marks omitted). In *Gunderson*, the Eighth Circuit set forth a five-part test for determining whether an employee's complaint about safety was a contributing factor in their dismissal. *Id.* It looks to (1) whether the disciplinary investigations that led to an employee's dismissal were related to the protected activity, (2) whether the employee's prior safety related activities were remote in time and disconnected from the disciplinary hearings by an "intervening event that independently justified adverse disciplinary action," (3) whether the

employee was represented by union counsel and the decision to discharge was upheld by the railroad internally and by an independent arbitrator, (4) whether the merits of the discharge were reviewed and upheld by the Department of Labor, and (5) whether the decision to discharge was made by the supervisors accused of safety-related bias. *Id.* at 969 Here, all relevant *Gunderson* factors point in Defendant's favor.

Turning to *Gunderson* factor one, "the disciplinary investigations that led to [plaintiff's] discharge were completely unrelated to his protected activity." *Id.* at 969. Plaintiff's reporting of the state of the company trucks was completely unrelated to the overtime and Lunchables incidents immediately leading to his discharge. In reviewing the disciplinary hearing transcripts relating to the July 10, 2017 Lunchables incident and the July 17, 2017 overtime incident, (Dkt. No. 51, Ex. A, Ex. B), there is no mention whatever of the condition of the company trucks during the hearings. What they exclusively concerned was Plaintiff's refusal to obey Metro-North orders.

Regarding factor two, Plaintiff's "prior safety-related activities were … disconnected from the disciplinary proceedings by an intervening event that independently justified adverse disciplinary action." *Id.* at 969. Even if Plaintiff's protected conduct of reporting the unsafe conditions of company trucks were temporally connected to his firing, Plaintiff's multiple instances of insubordination, and his refusal to work overtime during an emergency on July 17 in particular, were intervening events that independently justified adverse disciplinary action.

"An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference." *Nolley v. Swiss Reinsurance Am. Corp.,* 857 F. Supp. 2d 441, 461 (Title VII retaliation case citing state-law whistleblower, Americans with Disabilities Act, and section 1983

retaliation cases). Plaintiff produces no evidence showing that it was not the combination of his disciplinary record and his instances of subordination which formed the sole basis of the disciplinary proceedings against him and the subsequent decision to dismiss him.

Factor three also weighs in Metro-North's favor because, as in *Gunderson*, Plaintiff was represented by union counsel throughout his disciplinary proceedings. Further, Plaintiff's dismissal was upheld both by the railroad internally and by an independent arbitration panel.

Factor four is inapposite because the Department of Labor never completed its investigation into Plaintiff's petition to the Occupational Safety and Health Administration. (Dkt. No. 1 ¶ 9).

Factor five weighs in Metro-North's favor because Plaintiff makes no showing that the lower-level supervisor accountable for addressing Plaintiff's safety complaints about the trucks, Mr. Garcia, played any role in the adjudication of the charges against him.

All told, Plaintiff provides no evidence that his report about trucks in need of service was the basis of Metro-North's decision to terminate him. All record evidence makes clear that Plaintiff reported the trucks in need of repair to the manager in charge of repairing them, and that repairs were made. By Plaintiff's own admission, he had reported the condition of the company trucks "frequently" over the course of his employment; yet he was never reprimanded, suspended, or in any way retaliated against for doing so. (Gonzalez Tr. at 27-29). The manager in charge never told Plaintiff to stop asking that trucks be repaired, nor did he ever complain when Plaintiff reported issues with company vehicles. (*Id.* at 29).

The admissible evidence makes clear that Plaintiff – who had an existing disciplinary record – was removed from service on July 18, 2017 as a result of multiple instances of insubordination, which compounded his existing disciplinary record. Even viewing the evidence

in the light most favorable to Plaintiff leads only to the conclusion that, "To the extent that [Plaintiff] was disciplined, ... it was not for a reason prohibited by the FRSA; it was because of his failure to adhere to the [railroad's] policies and his unauthorized" and unprotected refusal to work overtime on the night of July 18, 2017. *Lockhart*, 266 F. Supp. 3d at 665. "The evidence in the record is overwhelming that [plaintiff] was not disciplined because [he] complained about safety, but solely because [he] was argumentative and defied [his] supervisor's instructions." See *Brisbois v. Soo Line R.R. Co.*, No. 15 Civ. 0570, 2016 WL 7423387, at *5 (D. Minn. Dec. 22, 2016), appeal filed, No. 17-1144 (8th Cir. Jan. 19, 2017) (granting summary judgment to FRSA defendant on plaintiff's claim that discipline for "insubordination" following plaintiff's refusal to follow instructions was retaliation for her initial safety complaint).

Accordingly, Metro-North's motion for summary judgment dismissing Count I is granted.

2. <u>Count II: Plaintiff's complaint about Foreman Walsh's qualifications was neither protected activity under the FRSA nor a contributing factor in his dismissal.</u>

In Count II of his FRSA claim, Plaintiff alleges that he engaged in protected activity under §§ 20109(a)(2) and 20109(b)(1)(A) "when he informed [Michael] Walsh that he felt unsafe receiving a safety briefing and working limits by someone without the proper qualifications." (Dkt. No. 1 ¶ 50). In his deposition, Plaintiff stated that his report stemmed from his belief that "Mr. Walsh was not qualified to be a foreman to take men out onto the tracks to perform work." (Gonzalez Tr. at 38).

Metro-North moves for summary judgment on Plaintiff's contention that his July 10, 2017 complaint about Walsh's qualifications constituted protected activity under the FRSA.

Regarding 20109(a)(2), Plaintiff can point to no federal rule, law, or regulation violated by Michael Walsh giving the safety briefing. Regarding 20109(b)(1)(A), Plaintiff has not made the threshold showing that his quibble about Walsh's qualifications was objectively or

subjectively reasonable. Plaintiff's alleged act of whistleblowing therefore does not qualify as protected activity under the relevant provisions of the FRSA.

Though the Court need not discuss the other elements of the prima facie case, I also find that Plaintiff's complaint about Walsh's qualifications was not a contributing factor in Plaintiff's dismissal.

    i. *Plaintiff's report about Foreman Walsh's qualifications does not fall within 49 U.S.C § 20109(a)(2).*

The FRSA provides a private right of action to railroad employees " discharge[d], demote[d], suspend[ed], reprimand[ed], or in any other way discriminate[d] against ... for (2) refus[ing] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security." 49 U.S.C § 20109(a)(2).

Plaintiff fails to point to any existing "Federal law, rule, or regulation" that establishes the minimum qualifications for taking men onto the tracks to work, let alone that such a law, rule, or regulation was violated by Foreman Walsh on July 9, 2017. 49 U.S.C § 20109(a)(2). This itself is fatal to a claim premised on 20109(a)(2).

Plaintiff has not, and here cannot, point to any Federal law, rule, or regulation violated by Defendant on July 10, 2017. While Plaintiff has stated that his "training and experience" suggested that the proper procedures were not followed on the night of July 10, 2017 in having Michael Walsh lead the men onto the track, (Dkt. No. 1 ¶ 20), the statute plainly requires pointing to a violation of a Federal law, rule, or regulation. Here we have no such law, rule, or regulation.

Plaintiff fails to point to any admissible evidence suggesting the opposite.

*ii. Plaintiff's report about Walsh's qualifications does not fall within 49 U.S.C. § 20109(b)(1).*

The FRSA also provides a private right of action to railroad employees "discharge[d], demote[d], suspend[ed], reprimand[ed], or in any other way discriminate[d] against ... for (A) reporting, in good faith, a hazardous safety or security condition; [or] (B) refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties." 49 U.S.C § 20109(b)(1); *see also id.* § 20109(d)(3) (creating an employee's private right of action).

Plaintiff has not established that his complaint about Foreman Michael Walsh's qualifications was a report in good faith about a hazardous safety or security condition. Plaintiff has not provided a scintilla of evidence showing that Walsh's leading the men onto the tracks that night was objectively – or even subjectively – a "hazardous safety or security condition" under 49 U.S.C § 20109(b)(1)(A).

Plaintiff has not established that this complaint was objectively reasonable. His statement that Walsh was not qualified as a Foreman is completely unsupported by any record evidence. Indeed, the record evidence points to the contrary. (Walsh Tr. at 77: [Responding to Gonzalez's complaint about his qualifications]: "I said that I'm qualified – I'm a Foreman who is qualified so it's acceptable for me to give a job briefing on the tracks before we go on the tracks."); (Mulligan Tr. at 40:19-20 [Responding to a question of whether Mr. Walsh was qualified]: "Yes he was."); (Pepitone Tr. at 81: "Q. Do you know whether or not Mr. Gonzalez was correct in the issue … of who gave the briefing and who took the men out on rack? A. I believe he was incorrect. In fact, I know he was incorrect."). Plaintiff's report was therefore not objectively reasonable.

Neither has Plaintiff established that his report was subjectively reasonable. Perhaps the strongest indicator that Walsh's giving the safety briefing was not a hazardous safety or security

condition is the fact that Plaintiff himself did not refuse to work once it was given. Plaintiff clearly felt that it was safe to work adjacent to the tracks, notwithstanding his statement that a different person should have given the briefing. Plaintiff stated that because of the nature of the work his gang was doing that night, "taking materials down to the side of the track,"(Gonzalez Tr. at 41-42) he agreed to work because Michael Walsh giving the briefing wasn't a "huge risk factor." *Id*. This decision was reflected by the fact that Plaintiff never brought a formal safety challenge about Walsh's qualifications. (Def. 56.1 ¶ 11).

Plainly, there is no admissible evidence suggesting that there was a hazardous safety or security condition for Plaintiff to report, and Plaintiff did not refuse to work because of it. Plaintiff has thus not made a showing that Foreman Michael Walsh's qualifications – or lack thereof – was a hazardous safety or security condition for purposes of the FRSA. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014) (Railroad employee's complaint that a banner test was inappropriately conducted was not protected activity under the FRSA because plaintiff objected to the manner in which the test was conducted, not that the way it was conducted created a hazardous safety condition). Plaintiff's concern about Walsh's qualifications were neither objectively nor subjectively reasonable and it therefore does not qualify as protected activity under the FRSA.

### iii. *Plaintiff's complaint about Walsh's qualifications was not a contributing factor in his dismissal.*

Even if Plaintiff's complaint about Walsh's qualifications were protected activity under the FRSA, the record evidence makes clear that it was not a contributing factor in his dismissal.

As with Count I, *Gunderson* factor one weighs in Metro-North's favor because the disciplinary investigation that led to Plaintiff's discharge was completely unrelated to his complaint about Michael Walsh's qualifications. In reviewing the transcripts of Plaintiff's

September 9, and September 11, 2017 disciplinary hearings, neither Plaintiff, nor anyone else, brought up Plaintiff's objection to Walsh's leadership. Those hearings solely concerned Plaintiff's (1) refusal to return to work after his lunch break on July 10, 2017 and (2) his refusal to work overtime on July 17, 2017.

Factor two similarly weighs in Metro-North's favor. It is true that Plaintiff's complaint about Walsh's qualifications was temporally connected to one of the two incidents that were the subject of his disciplinary hearing. Plaintiff made the complaint on the night of July 9 and was sent home on July 10 for his refusal to return to work after his lunch break. However, while Plaintiff's dismissal was temporally connected to his July 9, 2017 complaint, it was "disconnected from the disciplinary proceedings by an intervening event that independently justified adverse disciplinary action." *Id.* at 969. Namely, Plaintiff's subsequent refusal to return to work after his lunch break and his refusal to work overtime on July 17, 2017 independently justified his dismissal.

Factor three weighs in Metro-North's favor because Plaintiff was discharged after a hearing at which he was represented by his union.

Factor four is inapposite because the Department of Labor did not complete its investigation into the matter before Plaintiff brought action.

Factor five weighs in Metro-North's favor because James Pepitone, Director of the Metro-North Power Department, determined the appropriate discipline; neither Walsh nor Mulligan, the two lower-level supervisors Plaintiff accuses of bias, were responsible for the decision to discharge.

Metro-North's motion for summary judgment dismissing Count II is granted in favor of Metro-North.

3. <u>The Court will not address the merits of Plaintiff's claim related to the Fordham Incident.</u>

In his brief in opposition to summary judgment, Plaintiff asserts a new and not pleaded claim of retaliation relating to reporting a "near miss near Fordham Road to the FRA." (Dkt. No. 50, Pl. Br. in Opp., p. 5).

The deadline for amending Plaintiff's complaint was February 2, 2018. (Dkt. No. 13). He did not assert any claim about Fordham Road in an amended pleading. The deadline was more than six months before Plaintiff filed his brief opposing summary judgment. (Dkt. No. 50).

Allowing Plaintiff to constructively amend his complaint at this stage of the litigation would unfairly prejudice Defendants. Therefore, this Court declines to address the merits of that claim. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (upholding a District Court's decision not to address the merits of a claim raised for the first time in opposition to a motion for summary judgment); *see also Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) ("the central purpose of a complaint is to provide the defendant with notice of the claims asserted against it").

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

The Clerk of the Court is directed to remove Dkt. No. 34 from the Court's list of pending motions.

Dated: January 15, 2020

_____
Chief Judge

BY ECF TO ALL COUNSEL